## THE SANTA MARIA.

### THE JOHN E. MEHRER.

(District Court, D. Delaware. June 29, 1915.)

#### Nos. 728, 828.

1. COLLISION ⊙⊐95—MEETING TOWS—FAULTS OF TUGS.

A collision occurred at night on the Delaware river at a point where it bends to the eastward between the steamship Santa Maria and the barge Hampshire. The Santa Maria was going down the river in tow of the tug John E. Mehrer and having two other tugs alongside, being herself without steam, and the barge Hampshire was proceeding up the river in tow of the tug Sweepstakes, that barge and two others being towed tandem. When the tugs were within a quarter of a mile of each other, the Sweepstakes, which was on the western side of the channel, because of the bend and her long tow, signaled to pass port to port, which was agreed to by the Mehrer, although she was about the middle of the channel. Both tugs ported and passed in safety, but the starboard bows of the two following vessels came into collision. *Held*, that the Sweepstakes was primarily in fault for not signaling sooner or passing starboard to starboard, and also for not reducing speed, and that the Mehrer was in fault for assenting to the signal at the time it was given. All the other vessels *held* free from fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. ⊙⊐95.]

2. COLLISION ⊙⊐91—INLAND RULES—NARROW CHANNELS.

The requirement of article 25 of the Inland Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 101 [Comp. St. 1913, § 7899]) that in narrow channels vessels shall keep to the right or starboard side of the fairway is not absolute, but expressly applies only when that course is "safe and practicable," and is subject to the "special circumstances" provision of article 27 (Comp. St. 1913, § 7901).

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. ⊙⊐91.]

In Admiralty. Suits for collision by the Davis Coal & Coke Company, owner of the barge Hampshire, against the steamship Santa Maria, the tugs John E. Mehrer, Brandywine, and Bristol, with the tug Sweepstakes impleaded, and against William J. Grandfield and

others, owners of the Mehrer. Decree for libelant against the Sweepstakes and the Mehrer and its owners.

J. Frank Staley, of Philadelphia, Pa., for libelant.

Henry R. Edmunds, of Philadelphia, Pa., for Wm. J. Grandfield and others.

Howard H. Yocum, of Philadelphia, Pa., for the Santa Maria.

Howard M. Long, of Philadelphia, Pa., for the Bristol.

Edward F. Pugh, of Philadelphia, Pa., for the Brandywine.

John F. Lewis, of Philadelphia, Pa., for the Sweepstakes.

BRADFORD, District Judge. The controversy in this case grows out of a collision between the barge Hampshire and the steamship Santa Maria, which occurred in the main ship channel of the Delaware River in the vicinity of Grubbs Landing about 3 o'clock in the morning of September 6, 1906. The evidence is conflicting as to the precise point of the collision, it being stated by some of the witnesses that it was a short distance above, and by others a short distance below, the red light at Grubbs Landing. But it appears from the testimony that it was approximately opposite that light, whether slightly above or slightly below; and whether it was just above or just below, in the view I take of the case, is unimportant. It was in the bend of the channel where the Schooner Ledge Range and the Bellevue Range meet, and approximately in the middle of the channel—possibly a little to the eastward—and between the red light at Grubbs Landing and the red buoy in the easterly half of the channel; a straight line drawn from the red light to the red buoy passing a slight distance above an anchored dredge in the easterly half of the channel which had been engaged in government work there carried on. By reason of the presence of this dredge it was desirable or necessary that vessels of considerable size in ascending or descending the channel should keep to the westerly side of the dredge. The Hampshire and two other barges, the Annie M. Ash and the Elk Garden, were being towed by the tug Sweepstakes up the river tandem, or one astern of the other, in the order in which they are above named. The Hampshire was connected with the tug, and the several barges were connected together by hawsers running from stem to stern, each about 300 feet long, the total length represented by the tug, the hawsers and the barges being about 1200 or 1300 feet. The Santa Maria was being towed down the river by the tug John E. Mehrer, hereinafter referred to as the Mehrer, the tug Bristol and the tug Brandywine; the Mehrer being ahead and connected with the steamship by a hawser leading off the starboard bow of the latter, and the Bristol and the Brandywine being fastened alongside of the steamship, the former on her starboard quarter and the latter on her port quarter, and the length of the Mehrer and her tow being between 700 and 800 feet. The Hampshire received and was the only vessel that did receive damage from the collision, and the Davis Coal and Coke Company as her owner filed a libel in rem against the steamship, the Mehrer (now called the Pennsylvania), the Bristol, and the Brandywine. Subsequently the Sweepstakes was, on the petition of the Brandywine, brought in as a respondent under rule 59

(29 Sup. Ct. xlvi). The owner of the Hampshire also filed a libel in personam against William J. Grandfield and others, owners of the Mehrer. These two suits, numbered respectively 728 and 828, were consolidated for the purpose of saving costs and promoting convenience.

The master and crew of the Santa Maria were aboard of her, but she was without motive power. While there was sufficient steam in her donkey-engines to work the steering-gear and light the ship, there was no steam in her main boilers and she lacked power of self-propulsion. The steamship was being towed from Thompson's Point to Pigeon Point off the port of Wilmington, under a contract between the agent of the steamship and Paul L. Le Compt, who was engaged in the towage business. The compass course of the Schooner Ledge Range is about southwest by west one-half west and that of the Bellevue Range is about southwest, one quarter south, the difference between the two courses being approximately nineteen degrees. Owing to this angle between the two ranges, a vessel ascending the channel below its bend, and approximately along its center, would normally display its starboard or green side light to a vessel descending the channel above its bend and approximately along its center, and at the same time the descending vessel would display its port or red side light to the other vessel. If, however, vessels in proceeding to the bend in the channel substantially depart from following its center it is evident that on or a few moments before reaching the bend their side lights may not be so displayed to each other. By way of illustration, the ascending vessel by proceeding substantially to the westward of the center of the channel, may on or about the time of reaching the bend bear on the starboard bow of the descending vessel, the two vessels showing green to green; and the ascending vessel by porting her helm and swinging to starboard may so change her direction toward the east that while still bearing on the starboard bow of the descending vessel it would display to that vessel her port side light.

[1] These considerations will serve to solve certain questions respecting the position and course of the Sweepstakes and the Mehrer in relation to each other at and a few moments before the collision, which would otherwise be inexplicable.

It is shown by the evidence beyond dispute that when the Sweepstakes with her tow was proceeding up the channel but at some distance below the bend, and at the same time the Mehrer with her tow was moving down the channel, but at some distance above the bend, the starboard side lights of the Sweepstakes and her tow were visible to the Mehrer and her tow, and the port side lights of the Mehrer and her tow were visible to the Sweepstakes and her tow. The bend in the channel opposite or just above the dredge renders it natural and probable that the Mehrer with her tow approaching the bend in her course down the river should first see the starboard side lights of the Sweepstakes and barges she was towing, and that the port side lights of the Mehrer and the Santa Maria should have continued visible to the Sweepstakes from the time the Sweepstakes was at a point considerably down the river until she began to bear on the starboard bow of the Mehrer. The fact, as shown by the evidence,

that while at some distance from the Mehrer the Sweepstakes saw only her starboard side light, and that of the Santa Maria, shows that if the Santa Maria was going down approximately along the center of the channel and following the line of the channel—and the weight of evidence is to that effect—the Sweepstakes with her tow must have directed her course diagonally toward the westerly side of the channel and across the bow of the Mehrer and Santa Maria to such an extent that their port side lights were shut out. The Sweepstakes and her tow were nearly a quarter of a mile in length, and that she should have so directed her course is not unnatural but altogether probable in view of the length of her tow and the proximity of the dredge, especially if she intended to swing eastwardly when or just after passing the dredge. While the distance between the Sweepstakes and the Mehrer was lessening, the former vessel gave a single blast signal indicating to the Mehrer her intention to pass her port to port. The latter vessel promptly replied with a single blast, thereby acquiescing in the proposed maneuver of the former. At what distance the Mehrer and Sweepstakes were apart at the time the latter gave her single blast signal, is a point on which there is much loose and contradictory oral evidence, the distance being variously stated at from one-eighth to three-quarters of a mile. These varying statements of distance are as unsatisfactory and unreliable as usually are estimates of time in collision cases. But whatever may have been the exact distance the circumstances show that the Mehrer with its tow was too near the Sweepstakes to justify any attempt by the latter vessel unnecessarily to cross the bow of the Mehrer. At or about the time of the exchange of the single blast signals, the Sweepstakes ported her helm and swung sharply toward the easterly side of the channel, and the Mehrer ported her helm and swung toward the westerly side. A few moments after porting her helm, the Sweepstakes while swinging to starboard blew a danger signal but did not stop or lessen her speed. She and the Mehrer cleared each other, but the Hampshire, towed by the former, came in collision with the Santa Maria striking her on the starboard bow and receiving the damage on account of which this suit was instituted. The libelant contends that as the Sweepstakes was swinging to starboard in order to pass the Santa Maria red to red, the latter vessel gave a sudden sheer to port or eastward, bringing her bow across the course of the Hampshire, and that had it not been for such sheer the collision would not have occurred. This contention for several reasons cannot be sustained.

First, a clear preponderance of the testimony directly bearing upon the subject is against the alleged sheer. Secondly, a sudden and substantial sheer of the Santa Maria to the eastward was under the existing circumstances a physical impossibility. She was without the power of propulsion. There was nothing in the condition of wind or water to cause such a sheer, and there is satisfactory evidence that neither the steering of the Santa Maria by her own helm, nor the action of the Bristol and the Brandywine on her starboard and port quarters had the remotest tendency to produce such a sheer. Further, the Mehrer was to the extent of its ability trying to pull the bow of

the Santa Maria to starboard or westward by means of the tow-line. Under these circumstances the claim of a sudden sheer by the steamship is a fanciful, unnatural and impossible contention. The captain of the Mehrer, who has no bias in favor of the Santa Maria, says:

"Such a sheer to port as is alleged by the Sweepstakes was most unlikely to occur while the Mehrer was off to starboard pulling in that direction upon the Santa Maria's bow."

The testimony given by witnesses on the Sweepstakes and her tow as to the occurrence of the alleged sudden sheer may have been given in good faith and according to the understanding at the time of those so testifying, but is not reliable for the reason that owing to the motion, direction and position of the several vessels in approaching each other, and the comparative darkness, the Santa Maria may have appeared, contrary to the fact, to be moving eastwardly; and that she should have so appeared to those on the Sweepstakes and her tow was almost inevitable in view of the fact that she was not promptly following the Mehrer and of the further fact that by reason of her failure to do so her bow so projected across the curved line of approach of the Hampshire that the latter vessel struck her starboard bow after the Sweepstakes had passed in safety. There is no occasion to impute falsity to those who, misled by the appearance of things under the circumstances, supposed that the Santa Maria had made or was making a sudden sheer. From the size of the Santa Maria she was slow in responding to the efforts of the Mehrer to pull her to westward. She could not follow in the track of the Mehrer, but was moving down the river eastward of that track, thus exposing her starboard bow to collision with the Hampshire as she swung upward and eastwardly in tow of the Sweepstakes. There was a combination of inertia and momentum on the part of the Santa Maria but no sheer.

It is important to ascertain the distance between the Mehrer and the Sweepstakes and their relative positions in the channel, and with respect to each other at the time the latter vessel gave the one blast signal. Careful analysis of the evidence will enable this to be done with approximate accuracy. A preponderance of the evidence, direct and circumstantial, shows that the two vessels were not at the most more than a quarter of a mile apart when the single blast was blown by the Sweepstakes, and that the latter vessel immediately before porting her helm to cross the bow of the Mehrer was headed in a direction which, as hereinafter more particularly stated, could have been followed without risk of collision—the two vessels passing each other green to green. But it is claimed by the libelant that the Santa Maria was coming down, in the easterly half of the channel in violation of the rule governing the navigation of narrow channels, and that it was not only the right but the duty of the Sweepstakes with her tow to proceed up the channel on its easterly side. The evidence, however, shows that the Mehrer and Santa Maria were approximately in the middle of the channel. The presence of the dredge was enough to keep them from encroaching to any considerable extent on the easterly side of the channel.

[2] Further, Article 25 of the Rules of Navigation of Inland Waters of the United States in force at the time of the collision, provides as follows:

"Art. 25. In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such vessel."

And Article 27 of the Rules is as follows:

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

In Three Brothers, 170 Fed. 48, 95 C. C. A. 322, it was well said of Article 25, above quoted:

"Its purpose is to prevent collisions, not to produce them. It is not an inflexible rule to be followed in all cases, and, where it is manifest that a blind adherence will produce disaster, it is not only the right but the duty of the navigator to disregard it. The rule so states explicitly. It must be followed only 'when it is safe and practicable.'"

It is contended on behalf of the Sweepstakes that when she gave her one blast signal, she was distant from the Mehrer from a half to three-quarters of a mile, and that at that time the Mehrer was exhibiting her port side light to the Sweepstakes, and was bearing a point or more on the port bow of the latter vessel, indicating that these two vessels would pass each other red to red. If that were true the collision in question manifestly could not have occurred. This contention is met by fatal difficulties. If the Sweepstakes had been so far distant from the Mehrer when the single blast whistle was blown, and pursuing the course up the channel she claims to have kept, it would, owing to the bend in the channel, have been physically impossible that the Mehrer should then have borne on her port bow. She necessarily would have borne on the Sweepstakes starboard bow. Further, if the distance between the two vessels had been much less than a half or three-quarters of a mile when the single blast signal was given, and they were showing red to red, the collision could not have occurred. Aside from some mysterious and inexplicable sheer to port, both positive and extensive, which clearly is negatived, directly as well as circumstantially, no mere failure on the part of the Santa Maria, owing to her size and consequent inertia and momentum, promptly to respond to the pull of the Mehrer to starboard, could have caused or accounted for the collision. The witnesses for the Sweepstakes who say they saw the port side lights of the down coming tow bearing one to two points off her port bow at a time when she was coming up substantially on the ranges, evidently have confused what they saw after the Sweepstakes gave the single blast signal, and changed her course to starboard, bringing her red to red with the Mehrer, with what they now suppose they saw prior to such change. An undeniable and dominant fact in the case, so far as the Sweepstakes is concerned, is that she crossed the course of the Mehrer eastwardly within a perilously short distance from her in view of the length of tow of each of the vessels. As before stated, the Mehrer and the Santa Maria were descending the river approximately

in the middle of the channel. The Sweepstakes must therefore have been and was in the westerly portion of the channel at the time she gave the one blast signal, and swung toward the New Jersey shore; and at that time she bore slightly on the starboard bow of the descending Mehrer and Santa Maria, and there is evidence that until the Sweepstakes so changed her course she exhibited her starboard side light to the Mehrer and her tow, and both vessels were pursuing their respective courses, green to green. This evidence is strongly corroborated by the circumstances. The Sweepstakes and her tow of barges were nearly a quarter of a mile long, and in leaving the lower and entering upon the upper range the Sweepstakes would naturally keep so far toward the westerly side of the channel as to allow ample margin for her line of barges safely to pass to the west of the dredge, which was at a considerable distance from the easterly side of the channel, and thence to proceed on her course up the river. The Sweepstakes and the Mehrer, being green to green, and there being an abundance of water to the west of the Mehrer for the Sweepstakes and her tow to pass the Mehrer and her tow on that side, there was no sufficient, if any, reason why the Sweepstakes should not have followed a course to the west of the Mehrer. Had this been done the collision would not have occurred.

Opinions as to distance and lapse of time in collision cases are proverbially uncertain and unreliable, and the usual conflict of testimony on this point is here present. But such discrepancies do not obscure the facts that on the evidence after the green lights of the Sweepstakes and her tow became visible to the Mehrer and her tow as the former were coming up the Bellevue Range or course, there was only one change on the part of the Sweepstakes from green to red, which occurred when she swung to starboard under a ported helm in order to cross the course of the Mehrer; that the port side light of the Sweepstakes could not be seen by the Mehrer until after the former vessel had begun to swing to starboard in execution of her above intention; that the Sweepstakes was at the time she ported her helm closer to the Delaware shore than was the Mehrer; that immediately before beginning to swing to starboard the Sweepstakes was on the starboard bow of the Mehrer showing green to green; and that the Sweepstakes instead of porting her helm could have continued on her course, possibly, with a slight deflection westwardly, and safely passed the down coming tow, green to green. The Sweepstakes had two plain courses of action open to her; first, seasonably to give a signal to the Mehrer to pass red to red, and, secondly, in view of the Sweepstakes being in the westerly half of the channel, to hold or direct her course to the west of the down coming tow, passing green to green. But she did neither. She did not seasonably blow to the Mehrer or Santa Maria, nor did she hold her course to the west after reaching a point from which it was hazardous in the extreme to swing to starboard. Through inattention or recklessness or unjustifiable insistence on her supposed right to move up the river in the easterly half of the channel regardless of surrounding circumstances, she wrongly directed her course to starboard without attempting to stop or slacken her speed, which was about nine miles per

hour with the tide, and so brought about the collision. She was clearly in fault for not directing her course to the westward of the Mehrer and for not seasonably signaling the Mehrer to pass red to red; and for not stopping or attempting to stop or slacken her speed before getting into dangerous proximity to the Mehrer and her tow. The Sweepstakes is confronted with the horns of a dilemma. If she did not whistle until she was showing red to red with the Mehrer, she necessarily changed her course before whistling, and whistled too late; and if she whistled before changing her course, she whistled when she was showing green to green with the Mehrer, and there was no occasion or excuse for changing to starboard.

With respect to the Mehrer but little need be said. She as the leading tug was, to the exclusion of the Santa Maria, the Bristol and the Brandywine, entrusted with the selection of the course of navigation. Knowing that she had in tow a large and ponderous vessel impossible quickly to be diverted from the course she was pursuing she was clearly in fault in assenting to and acting upon the single blast signal received from the Sweepstakes, instead of refusing to join in the proposed maneuver and promptly giving danger signals; and slackening her speed as far as could be done with safety. Had she done so it is probable that the Sweepstakes would not have persisted in pursuing her eastward swing from the westerly side of the channel, and the collision might and probably would have been avoided.

But while the Sweepstakes and the Mehrer are responsible for the collision the evidence does not, I think, disclose fault on the part of the Hampshire, the Santa Maria, the Bristol or the Brandywine. The Hampshire was controlled in her movements by the Sweepstakes and her own helm. An able seaman was in charge of the Hampshire's wheel, and she followed without unnecessary or undue deflection the course of the Sweepstakes.

The Santa Maria, without power of self-propulsion was, as before stated, being towed down the river under a contract with Le Compte, who was engaged in the business of towing vessels. While her captain and crew were on board of her, she was nevertheless in charge of and wholly subjected to the control of the Mehrer, as the leading tug, and the Bristol and the Brandywine, placed respectively on her starboard and port quarters to steady her and to take part in controlling her movements as should be directed. The captain of the Bristol was entrusted with the general management of the towage service, the selection of the course to be followed down the river, however, being exclusively confided to the Mehrer. It appears from the evidence that both the Bristol and the Brandywine were faithful in their discharge of duty. The Santa Maria escorted by the three tugs had safely and properly been brought down the river from Thompson's Point on her way to Pigeon Point until the Sweepstakes had given her single blast signal and the same had been answered by the Mehrer. Promptly on hearing the Mehrer's answering blast, the wheel of the Santa Maria was ported and the engine of the Bristol was put astern, and that of the Brandywine ahead, in order to facilitate the swinging of the Santa Maria to starboard after the Mehrer; and this continued until it became manifest that a collision was impending, when the engines of

both tugs were put astern in order to overcome, if possible, the headway of the Santa Maria. The sheer, however, of the Sweepstakes across the course of the Mehrer and the Santa Maria was so sudden and in such close proximity to them, that it was impossible to overcome the momentum of the Santa Maria and her tendency to move without deflection down the channel before the Hampshire came in contact with her starboard bow. On behalf of the Hampshire and the Sweepstakes great stress has been laid on the contention that the Bristol and the Brandywine were too small, and without sufficient power to render it proper to employ them in the towage service in question, and further that the Santa Maria was at fault in permitting them to engage in such service. This position cannot be maintained. The fact that the tugs in charge of the Santa Maria found it impossible to turn her to starboard so speedily as to escape the consequences of the sudden and wrongful sheer of the Sweepstakes across her course furnishes no criterion of their insufficiency successfully to perform the towage service under ordinary conditions. Much more powerful tugs would have failed under similar circumstances. As was well said by one of the witnesses for the Mehrer, "a big ship won't move in an instant, I don't care how many boats you have on her." The tugs had safely taken the Santa Maria down the river without accident prior to the maneuver of the Sweepstakes, and there is nothing in the evidence to indicate that in the absence of such fault on the part of the Sweepstakes they would not have successfully completed the trip without mishap of any kind.

There is a preponderance of evidence that the tugs were of sufficient power under ordinary circumstances to tow a vessel of the size of the Santa Maria on such a trip as she was making. She was in the exclusive charge and control of the tugs, and although her master and crew were on board they took no part in controlling her navigation. The conclusion reached renders unnecessary any discussion of the liability of a vessel under the exclusive management and control of tugs insufficient in power to prevent a collision.

In reaching a conclusion the ex parte affidavit of the mate of the Sweepstakes which was improperly forced into the case against the protest of opposing counsel has been wholly disregarded. Its genesis, the manner in which it was prepared, and the circumstances attending and surrounding it, do not commend it to the favorable consideration of the court. To recognize it would involve a wide departure from the uniform practice observed here.

The libel as against the Santa Maria, the Bristol, and the Brandywine must be dismissed with costs. It must be sustained, however, with costs, as against the Sweepstakes and the fund in court representing the Mehrer; and both of those vessels having been at fault the damages and costs must be equally divided. The cause must be referred to a commissioner to assess the damages and costs.

A decree in accordance with this opinion may be prepared and submitted.